UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| KATHLEEN BOXELL | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-CV-89 JD |
| | ) | |
| THE PLAN FOR GROUP INSURANCE | ) | |
| OF VERIZON COMMUNICATIONS, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This is an ERISA case in which the plaintiff, Kathleen Boxell, asserts that her long-term disability benefits were wrongfully terminated. The defendant, the Plan for Group Insurance of Verizon Communications Inc., filed a counterclaim seeking reimbursement of overpayments that resulted from Ms. Boxell's receipt of retroactive social security benefits. The parties have filed cross-motions for summary judgment as to both claims, [DE 38, 40], and those motions are fully briefed. The Plan also filed motions to strike exhibits that Ms. Boxell attached to her opening and response briefs, and in addition to opposing those motions, Ms. Boxell moved in the alternative for leave to amend her complaint. Each of these preliminary motions has been fully briefed as well. For the following reasons, the Court denies the motions to strike and the motion for leave to amend, grants Ms. Boxell's motion for summary judgment as to her claim for benefits, and grants the Plan's motion for summary judgment, but only as to its counterclaim for reimbursement.

**I. FACTUAL BACKGROUND**

Ms. Boxell was employed by Verizon Communications Inc. as a Network Engineer. (R. 128). Her job required her to sit at her desk and work on her computer for about 95% of her time,

although she occasionally had to visit job sites as well. (R. 108, 129). In 2009, Ms. Boxell began experiencing pain in her lower back and in both legs, and initial tests suggested she may have Paget's disease in her L5 vertebrae, a disorder characterized by abnormal bone growth that can cause bones to become fragile or misshapen. Ms. Boxell saw several specialists, but the source of her pain and her precise diagnosis remained unclear. Although Ms. Boxell was initially able to work through the pain, it gradually became worse and interfered with her ability to work. (R. 110). On September 29, 2009, with the approval of her doctor, Ms. Boxell went on medical leave and sought disability benefits.

A.     **The Plan**

As a Verizon employee, Ms. Boxell was eligible to receive short-term and long-term disability benefits under the Plan for Group Insurance, an employee benefit plan governed by the Employee Retirement Income Security Act. Under the Plan, employees are eligible to receive short-term disability benefits for up to 12 months if they become totally disabled. (R. 17). Employees are considered "totally disabled" if, "as a result of illness, injury or pregnancy," they (1) "are unable to perform the essential functions of [their] own job"; (2) "are not working at another job"; and (3) "are receiving appropriate care and treatment from a doctor on a continuing basis." (*Id.*).

Claimants who remain totally disabled after exhausting their 12 months of short-term disability benefits can then begin receive long-term disability benefits. (R. 31). To be eligible for these benefits, claimants must be totally disabled, be under the care of a doctor, and be undergoing appropriate care and treatment. (R. 33–34). In addition, during the first 12 months of receiving long-term disability benefits, claimants must be "unable to earn more than 80% of [their] annual benefits compensation at [their] own occupation," and thereafter, they must be

"unable to earn more than 60% of [their] annual benefits compensation from any employer at any gainful occupation" to remain eligible for benefits. (R. 34).

The Plan also contains limitations on the amount of long-term disability benefits that are payable where a claimant's disability is due to certain types of conditions. Most relevant here, the Plan contains a provision limiting benefits for neuromusculoskeletal and soft tissue disorders, which states:

> Long-term disability (LTD) benefits are limited to 12 months during your lifetime if you are totally disabled due to a neuromusculoskeletal and soft tissue disorder including, but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue. This includes sprains and strains of joints and adjacent muscles, unless the disability has objective evidence of: seropositive arthritis; spinal tumors, malignancy or vascular malformations; radiculopathies; myelopathies; traumatic spinal cord necrosis; [or] musculopathies.

(R. 41). The Plan contains definitions for some, but not all, of those terms.

The Plan also requires all claimants to apply for social security disability benefits, and to appeal any adverse decisions through the entire administrative appeals process. (R. 36). If claimants receive an award social security disability benefits, those benefits reduce the benefits payable by the Plan by an equal amount. (R. 36). Further, when claimants receive retroactive awards of social security disability benefits, those benefits retroactively reduce the amounts payable by the Plan as well, and the Plan reserves the right to recover any excess payments it may have made in those prior periods. (R. 37, 56).

The Plan names MetLife as the claims administrator, and gives it "authority to make final determinations regarding eligibility and benefit claims under the disability income protection program." (R. 46–47). The Plan further vests MetLife with the discretionary authority to interpret the Plan, make factual determinations, and determine whether a claimant is eligible for benefits. (R. 47). However, MetLife bears no financial responsibility for the benefits under the Plan—

benefits are paid from trust accounts that are self-insured and that are funded through employer or employee contributions. (R. 47).

## B.    The Claim History

Ms. Boxell filed a claim for short-term disability benefits on September 29, 2009, citing back pain that was exacerbated by sitting at her desk all day and by driving. (R. 108). MetLife processed the claim, and determined that Ms. Boxell qualified as disabled and was entitled to short-term disability benefits for about a three-week period. (R. 131). MetLife subsequently extended her benefits on multiple occasions, as despite her treatment, Ms. Boxell remained unable to return to work. (R. 142–54, 162–63, 165, 206, 228). On January 6, 2010, Ms. Boxell received a Functional Capacity Evaluation, which found that due to the pain in her lower back and legs, Ms. Boxell was limited to sitting only occasionally. (R. 3049). Dr. Joseph Mattox, Ms. Boxell's primary care physician, also stated that she should not return to work due to her chronic pain and the effects of her narcotic pain medication. (R. 4222).

On June 18, 2010, Ms. Boxell began seeing a new pain management specialist, Dr. Joseph Fortin. (R. 4061). Dr. Fortin's impressions were that Ms. Boxell suffered from Paget's disease and chronic low back pain, but he was unsure of the precise cause of the pain. (R. 4064). On July 13, 2010, Dr. Fortin responded to several questions posed by MetLife relative to Ms. Boxell's disability, and he recommended no prolonged sitting, standing, or walking, and stated that Ms. Boxell must change positions every 15 to 20 minutes. (R. 4060). Dr. Fortin also made similar recommendations in completing functional capacity assessments on September 10 and 28, 2010. (R. 4005, 3977)

On October 6, 2010, MetLife extended Ms. Boxell's short-term disability benefits through their maximum duration of 12 months, and referred her file to its long-term disability benefits division. (R. 3972). Shortly thereafter, MetLife determined that Ms. Boxell was eligible

to receive long-term disability benefits under the Plan. (R. 3968). In its letter notifying Ms. Boxell of this decision, MetLife stated that the "medical documentation on file substantiates that you currently meet the definition of totally disabled." (R. 3970). MetLife also indicated that because of a limitation provision in the Plan, these benefits would be only be payable for 12 months, absent additional findings:

> Our records indicate that you are disabled due to low back pain and bilateral lower extremity pain, conditions which The Plan places a limit on the number of benefit payments payable. The condition is limited to twelve months of benefits under this policy. Therefore, the maximum benefit duration due to the limited condition will be reached on September 28, 2011. In order to qualify for disability benefits until September 28, 2011, you must continue to satisfy the definition of disability and all other requirements of you plan.

> Benefits may continue after September 28, 2011 if you continue to satisfy the definition of disability solely due to other non-limited medical condition(s) and other plan requirements.

(R. 3970). MetLife also notified Ms. Boxell that the Plan required her to apply for social security disability benefits, and it referred her to attorneys to assist her with that claim. (R. 3963).

On December 21, 2010, Dr. Fortin and Dr. Mattox each completed a functional capacity assessment for Ms. Boxell. Dr. Fortin's recommendation remained the same, as he stated that due to Ms. Boxell's chronic low back pain and bilateral leg pain, Ms. Boxell could not sit, stand, or walk for prolonged periods and that she must change positions every 15 to 20 minutes. (R. 3919). Dr. Fortin also indicated that he had advised Ms. Boxell not to return to work. (R. 3918). Dr. Mattox offered a different opinion, though. He stated that Ms. Boxell was able to work without any physical limitations at all, that she was able to sit, stand, and walk continuously for eight hours a day, and that she could immediately return to work full time. (*Id.*). MetLife received this assessment, but noted in its claims log that Dr. Mattox's opinion "is contradictory to Dr. Fortin and does not address the severity of Paget[']s disease." (R. 348). In a subsequent

medical review of Ms. Boxell's file, MetLife concluded that "Medical continues to support functional limitations to prevent performance of her own job." (R. 361).

On December 30, 2010, Dr. Fortin also diagnosed Ms. Boxell with fibromyalgia, stating in his office visit notes that "[p]alpation reveals tender points consistent with fibromyalgia." (R. 3895). Dr. Fortin prescribed Cymbalta for that condition, and further noted that "[p]ain control is felt to be 'not so good.'" (R. 3894–95). In subsequent monthly office visits, Dr. Fortin listed his impressions as including "Diffuse myalgias, arthralgias, and paresthesias secondary to fibromyalgia syndrome" and "History of Paget's disease." (R. 3899, 3892, 3887, 3884, 3875). Having been diagnosed with fibromyalgia, Ms. Boxell asked MetLife whether this condition was also subject to a 12-month limitation under the Plan. (R. 370). The claims specialist was initially unsure, but an April 28, 2011 entry in the claims log states, "Claimant remains under treatment with pain management for chronic diffuse pain, myalgias, paresthesias secondary to Fibromyalgia, which is an LDB [Limited Disability Benefit] condition." (R. 401). MetLife informed Ms. Boxell the following day that her fibromyalgia was subject to the limitation provision, and that her long-term disability benefits were still set to terminate on September 28, 2011. (R. 403).

On September 16, 2011, shortly before the 12 month period expired, MetLife sent Ms. Boxell a letter formally advising her that her long-term disability benefits were terminating. (R. 3841). The letter stated:

> In reviewing your file, the medical documentation indicates that you are disabled due to low back pain and fibromyalgia, Neuromusculoskeletal/Soft Tissue conditions. These diagnoses fall under the limited benefit provision of your Plan, and has [*sic*] a limitation of 12 months. Therefore the maximum duration for benefit payments is September 28, 2011.

(R. 3841). MetLife advised Ms. Boxell that she could appeal this decision within 180 days, and it invited her to submit any additional evidence that would "support a disability other than

6

neuromuscular, musculoskeletal, or soft tissue disorder and/or that support[s] an exclusion to the provision." (R. 3842). In a phone call to Ms. Boxell around that time, a claims representative told Ms. Boxell, "[W]e are not questioning disability. Plan has a LBC [Limited Benefit Condition] clause." (R. 446).

Ms. Boxell retained counsel, and on March 13, 2012, her counsel submitted an appeal of MetLife's decision, accompanied by a lengthy letter and nearly one thousand pages of exhibits. (R. 2755). The letter is littered with ad hominem attacks on MetLife and its practices.[1] As to Ms. Boxell's claim in particular, the letter primarily argued that Ms. Boxell's Paget's disease was the source of her disability, and that it fell within an exception to the limitation for neuromusculoskeletal and soft tissue disorders because it was a myelopathy, so that Ms. Boxell's benefits should have continued beyond the 12-month limitation. (R. 2758).

MetLife took the appeal under consideration and retained Dr. Neil McPhee, a consultant, to independently review Ms. Boxell's claim. MetLife posed four questions to Dr. McPhee, asking him to determine whether Ms. Boxell was disabled due to any condition that was exempted from the limitation provision, whether she was disabled due to any other conditions, whether she was disabled due to the side effects of any medications, and whether she was receiving appropriate care. (R. 2740–42). Dr. McPhee reviewed all the medical records in the file and also called and spoke with Dr. Fortin and Dr. Mattox. During his discussion with Dr. McPhee, Mr. Mattox opined that Ms. Boxell's "complaints are out of proportion to what would be expected" and that "any limitation in her functioning appears to be by her choice." (R. 2736). Dr. Fortin disagreed with this assessment, though, and stated that while Ms. Boxell "does not fit

---

[1] For example, counsel asserted that the independent medical examiner MetLife would retain to review Ms. Boxell's claim would be "a fast talking carny," a "con artist, a scam artist," (R. 2800), which does not appear to have gained his client any favor with the expert MetLife subsequently retained. (R. 1729).

in a diagnos[t]ic box," "her pain complaints may be the result of a confluence of factors such as fibromyalgia, sensitivity with Paget's disease, and chemical radiculitis." (R. 2735).

Dr. McPhee submitted his report on April 9, 2012. In responding to MetLife's questions, he first offered terse conclusions that Ms. Boxell did not have any conditions that fit the exemptions to the limitation provision. (R. 2740–41). Dr. McPhee then surveyed her other conditions, and concluded that none of them justified any physical limitations. (R. 2741–42). He stated, in part,

> The low back pain complaints are out of proportion to the findings on imaging studies and to her examinations by multiple providers over time with her appearing well and in no distress with variable and mild tenderness. . . . The tender points used to diagnosis [*sic*] fibromyalgia would not support physical functional limitations. She has normal joint motion and neurological function, and in fact activity would be encouraged with the diagnosis and may be therapeutic and aid in diverting her focus away from her self reported pain complaints.

(*Id.*). He finally opined that none of Ms. Boxell's medications caused any limitations, but that Ms. Boxell had received appropriate care for her conditions. (R. 2742).

On May 25, 2012, however, an administrative law judge of the Social Security Administration reached the opposite conclusion, finding that Ms. Boxell was disabled and entitled to social security disability benefits. (R. 2687). The ALJ found that Ms. Boxell's severe impairments included, among others, Paget's disease, lumbar facet syndrome with radiculopathy, chronic fatigue syndrome, and fibromyalgia. (R. 2689). The ALJ found that Ms. Boxell possessed the residual functional capacity to perform less than the full range of sedentary work, and that her condition would require her to miss more than 2 days of work per month. (R. 2690–91). Based on these limitations, the vocational expert opined that there were no jobs in the national economy that Ms. Boxell could perform, so the ALJ found that Ms. Boxell qualified as disabled from September 29, 2009, through the date of the decision. (R. 2687, 2693). The ALJ

concluded by noting that "[m]edical improvement is expected with appropriate treatment" and that "a continuing disability review is recommended in 24 months." (R. 2694).

MetLife then sent a series of follow-up questions to Dr. McPhee, and asked him to consider the social security decision as well. In an addendum to his report, dated September 10, 2012, Dr. McPhee addressed each of the categories of exemptions to the Plan's limitation provision and explained why none of them were present. (R. 1735–36). He also addressed Paget's disease at length, and explained that for a number of reasons, Paget's disease had not been causing Ms. Boxell's pain, and that even if it had, it did not constitute a myelopathy, so it would not establish an exception to the limitation provision. (R. 1739). Dr. McPhee also addressed Ms. Boxell's other conditions, but his explanation as to why none of those conditions were disabling was identical to the explanation in his first report. (R. 1737–38).

After receiving this addendum, MetLife forwarded Dr. McPhee's report to Dr. Fortin and Dr. Mattox on October 10, 2012 for their review. It also provided a copy of the report to Ms. Boxell, but did not invite any response from Ms. Boxell or indicate which parts of Dr. McPhee's report, if any, it intended to rely on in deciding Ms. Boxell's appeal. (R. 1697). On November 6, 2012, Ms. Boxell's counsel submitted a second lengthy letter to MetLife in support of her appeal, attaching another thousand pages of exhibits. (R. 593). In his letter, Ms. Boxell's counsel criticized Dr. McPhee's conclusions as to whether Ms. Boxell was disabled due to fibromyalgia or Paget's disease, and he urged MetLife to disregard those conclusions. (R. 593).

By a letter on February 1, 2013, however, MetLife upheld its termination of Ms. Boxell's benefits and denied her appeal. The letter quoted at length from Dr. McPhee's reports, but did not contain any independent evaluation of the record. (R. 566). Consistent with Dr. McPhee's

conclusion, the Plan found, for the first time throughout the entire claims process, that Ms.

Boxell did not qualify as disabled under the policy:

> The information in the administrative claim file does not substantiate functional limitations beyond September 28, 2011. Our current review of the administrative claim file, which included an IPC [Independent Physician Consultant] review who opined that your client's medical records, [*sic*] does not support functional limitations and or restrictions and limitations for the time period under review. Therefore, your client did not satisfy the Plan's Definition of Disability and no additional LTD benefits are available.

(R. 575). The letter also quoted the Plan's limitation provisions, and stated that Ms. Boxell did

not have any conditions that were not subject to those provisions. (*Id.*). Accordingly, the Plan

declined to pay any benefits after September 28, 2011. (*Id.*).

Ms. Boxell responded by filing her complaint in this matter, asserting a claim under 29

U.S.C. § 1132(a)(1) and seeking reinstatement of her benefits. [DE 1]. The Plan answered Ms.

Boxell's complaint, and filed a counterclaim as well, seeking reimbursement of the overpayment

of Ms. Boxell's long-term disability benefits that resulted from her receipt of retroactive social

security disability benefits. [DE 10]. Ms. Boxell initially sought to conduct discovery on various

subjects, but the magistrate judge denied her motion and Ms. Boxell did not ask this Court to

review that ruling. The parties thus filed the stipulated administrative record, and have now filed

cross motions for summary judgment as to both claims.

## II.  PRELIMINARY MATTERS

Before proceeding to the merits of the motions for summary judgment, there are two

motions to strike exhibits and a motion for leave to amend the complaint to resolve. In support of

her motion for summary judgment, Ms. Boxell attached two exhibits: a declaration from a

MetLife employee certifying that the administrative record included all documents relevant to

Ms. Boxell's claim, and the transcript of a deposition of a MetLife employee taken in an

unrelated case. [DE 38-1, 38-2]. The Plan moved to strike these exhibits on the basis that they

are outside the administrative record and thus cannot properly be considered given the deferential standard of review of its claims determination. [DE 46]. In her response to the Plan's motion for summary judgment, Ms. Boxell submitted another exhibit—an excerpt from an insurance policy that MetLife either issued to or administers for a different company [DE 49]—and the Plan again moved to strike this exhibit. [DE 50]. Ms. Boxell responded in opposition to these motions, arguing on several grounds that the exhibits can properly be considered. However, in the alternative to her opposition to these motions, she moved for leave to amend her complaint to add a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3), under which she believes this evidence could be considered. [DE 54].

As to the declaration certifying that the administrative record is complete, the Court denies the motion to strike. The declaration was already part of the record in this matter, as the Plan filed it along with the administrative record. [DE 33-1]. Further, Ms. Boxell only uses this declaration to confirm that the administrative record is complete, which is an appropriate purpose, so there is no need to strike this exhibit.

As to the other exhibits, the Court denies the motions to strike as moot, as the exhibits are inconsequential to the resolution of this matter. The deposition that Ms. Boxell attached to her opening brief was taken in a separate suit relating to an insurance policy that MetLife issued directly to an individual, meaning the suit was for breach of contract and was not governed by ERISA. *Hinson v. Metropolitan Life Ins. Co.*, No. 4:11-cv-1522 (N.D. Cal). The policy at issue there apparently had different terms than the ERISA plan at issue here, though those terms are not present in the record in this case. Ms. Boxell relies on this deposition because the plaintiff in that matter had fibromyalgia, and although MetLife initially told the plaintiff that fibromyalgia was subject to his policy's limitation on benefits for neuromusculoskeletal ("NMS") and soft

tissue disorders, the employee who processed the claim (not the same one who processed Ms. Boxell's claim) later acknowledged that the condition was actually subject to the policy's limitation provision relative to chronic fatigue instead. Ms. Boxell argues that MetLife thus categorically interprets fibromyalgia as falling under chronic fatigue limitations of all of its policies, not the NMS limitations. Because the Plan here contains a NMS limitation but not a chronic fatigue limitation, Ms. Boxell argues that fibromyalgia must not be subject to any limitations under her policy and that MetLife must have been attempting to defraud her by suggesting otherwise.[2]

These conclusions simply do not follow. First, they rest on the premise that MetLife must interpret every one of the policies it issues or administers the same, regardless of the precise language or content of those policies, but Ms. Boxell provided no authority for such a proposition. Further, the policy at issue in *Hinson* was a different policy with different terms subject to different laws than the ERISA plan at issue here. Thus, there is no inherent inconsistency in interpreting provisions in that policy differently from different provisions in the Plan. Given the discretion vested in MetLife to interpret the terms of the Plan, the pertinent inquiry is whether MetLife interpreted this specific Plan reasonably, not whether it interpreted other plans in the same way or whether it abused its discretion or breached its contracts in other matters. *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 768 (7th Cir. 2010) ("But whether MetLife's [other] cases were won or lost, abuse of discretion is a fact-specific inquiry. This court is concerned only with Holmstrom's claim and the context and circumstances of

---

[2] Counsel further extrapolates this flawed logic into accusations bordering on the fantastical: "So we have a secret rule, so secret that it has never been reduced to writing, which claims personnel who are adjudicating hundreds or thousands of disability claims per year are unaware of, except intermittently. And when they become aware of it they are apparently are told to lie about it, as Stachnik did here. The secrecy, the lack of a writing, the duplicity, and the dishonesty is all indicative of a deliberate, carefully orchestrated fraud."

MetLife's denial as demonstrated by the administrative record in this case."). The *Hinson* deposition is thus immaterial here.

The excerpt from the unrelated benefits policy that Ms. Boxell attached to her response brief is immaterial for similar reasons. Ms. Boxell argues that a difference in language between that policy and the Plan must affect the way MetLife interprets the policy at issue here. Again, though, the only question here is whether MetLife's interpretation of the Plan was reasonable, and the fact that other plans MetLife administers contain different language has no bearing on that question. Accordingly, whether or not these exhibits can be properly considered in this posture, the Court need not strike them, as they have no effect on the resolution of this matter, so the Court denies the motions to strike as moot. The Court also denies Ms. Boxell's motion for leave to amend her complaint, which she concedes would be moot if the Court denies the motions to strike. The Court therefore proceeds to resolving the motions for summary judgment on their merits.

## III. STANDARD OF REVIEW

On summary judgment, the moving party bears the burden of demonstrating that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Where a factual record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial, and summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Kerri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006); *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). However, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

## IV.  ANALYSIS

The parties have moved for summary judgment both as to Ms. Boxell's claim for benefits and as to the Plan's counterclaim for reimbursement, and the Court addresses each claim in turn.

**A.      Boxell's Entitlement to Long Term Disability Benefits**

Ms. Boxell contests the Plan's decision to terminate her long-term disability benefits. "Judicial review of an ERISA administrator's benefits determination is de novo unless the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). However, where an ERISA plan vests such discretion in the administrator, "the court applies a more deferential standard, seeking to determine only whether the administrator's decision was 'arbitrary and capricious.'" *Id.* (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 860–61 (7th Cir. 2009)). Here, the Plan vests MetLife, its claims administrator, with the discretionary authority to interpret the plan, make findings of fact, and determine whether a claimant is eligible for benefits. (R. 47). Therefore, as both parties agree, and as the magistrate judge previously held, the deferential arbitrary and capricious standard of review governs Ms. Boxell's claim.

Under this standard, a plan administrator's interpretation will only be overturned when it is "unreasonable, and not merely incorrect." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000); *Edwards v. Briggs & Stratton Retirement Plant*, 639 F.3d 355, 360 (7th Cir. 2011) ("Put simply, an administrator's decision will not be overturned unless it is downright unreasonable.") (internal citations omitted). "Review under this deferential standard is not a rubber stamp, however, and '[the Court] will not uphold a termination [of benefits] when there is an absence of reasoning in the record to support it.'" *Holmstrom*, 615 F.3d at 766 (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774–75 (7th Cir. 2003)). "ERISA also requires that 'specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for full and fair review by the administrator.'" *Id.* (quoting *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp. No. 506*, 545 F.3d 555, 559 (7th Cir. 2008)). "The Plan must provide a reasonable explanation for its determination and must address any reliable, contrary evidence presented by the claimant." *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009)

As an initial matter, Ms. Boxell makes a threshold argument for reversal based on the doctrine of judicial estoppel due to the Social Security Administration's finding that she was disabled. The Plan required Ms. Boxell to apply for social security disability benefits, and MetLife arranged for an attorney to represent her in that matter. Ms. Boxell ultimately prevailed and received a fully favorable decision from the Social Security Administration, which found that she was disabled and unable to engage in gainful employment. (R. 2693). In addition, it was the Plan that stood to gain the most from that decision, as the social security benefits directly reduced the amount to which Ms. Boxell was entitled under the Plan, both prospectively and retroactively. Ms. Boxell thus contends that because the Plan assisted in and benefitted from her

successful argument to the SSA that she was disabled, it should be judicially estopped from arguing to the contrary in this matter.

However, the Seventh Circuit has rejected this argument on multiple occasions: "we have repeatedly emphasized that the SSA's determination of disability is not binding on employers under ERISA." *Love*, 574 F.3d at 398 (noting also that "SSA determinations are often instructive, but they are not determinative"); *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1087 (7th Cir. 2012) ("Cigna is correct that inconsistency between its final determination and the ALJ's final decision does not prove that Cigna was mistaken."); *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 610 (7th Cir. 2007) ("[T]he Plan was not estopped from independently interpreting the terms of its policy merely because the SSA found Mote to be disabled pursuant to its standards . . . ."); *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) (holding that while these circumstances may fall "within the penumbra of the doctrine of judicial estoppel," that doctrine "is technically not applicable" in these circumstances and "does not provide an independent basis" for awarding benefits); *see Glenn*, 554 U.S. at 118 (weighing the plan's treatment of the SSA decision as part of the abuse of discretion analysis, but not considering the SSA decision to be binding on the plan). While plan administrators must consider an SSA decision and articulate reasons for a contrary decision, they are not bound by such a decision. Accordingly, the Plan is not judicially estopped from denying Ms. Boxell benefits, so the Court turns to whether the Plan acted arbitrarily and capriciously in terminating Ms. Boxell's benefits.

### 1.      The Plan's Decision Was Arbitrary and Capricious

Ms. Boxell presents a number of arguments on this front, going so far as to accuse the Plan of having "perpetrated [a] systematic and sophisticated fraud." [DE 48 p. 25]. While the record does not support such far-reaching charges, the Court ultimately agrees with Ms. Boxell

that the Plan acted arbitrarily and capriciously in terminating her benefits. In sum, the Plan relied on flawed reasoning in finding that Ms. Boxell's fibromyalgia was not disabling and in discounting the Social Security Administration's conclusion that she was disabled, it upheld its denial of her benefits based on different reasons than it initially denied them, and it failed to adequately acknowledge and justify its departure from its previous findings. Thus, despite the presence of some potential support for the Plan's determination in the record, the Court concludes that the Plan's decision was arbitrary and capricious.

### a.   Fibromyalgia

First, the reasons the Plan offered for concluding that Ms. Boxell's fibromyalgia was not disabling do not support its conclusion. The Plan's reasons were as follows:

> The tender points used to diagnosis [*sic*] fibromyalgia would not support physical functional limitations. There was normal joint motion and neurological function. The IPC [Independent Physician Consultant, Dr. McPhee] opined activity would be encouraged with the diagnosis and may be therapeutic and aid in diverting focus away from self-reported pain complaints.

(R. 571). Taking these reasons in turn, the statement that "[t]he tender points used to diagnos[e] fibromyalgia would not support physical functional limitations" is a *non sequitor* in this context. By "tender points," the Plan is referring to the diagnostic test for fibromyalgia, under which a patient is considered to have fibromyalgia if they have tenderness in 11 or more of the 18 trigger locations on the body. *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003). However, this test can only detect the presence of fibromyalgia, not its severity. *Id.* ("The disease itself can be diagnosed more or less objectively by the 18-point test . . . , but the amount of pain and fatigue that a particular case of it produces cannot be."); *see also Jacobson v. SLM Corp. Welfare Benefit Plan*, 1:08-cv-267, 2009 WL 2841086, at *8 (S.D. Ind. Sept. 1, 2009) (Hamilton, J.) ("The tender point test injects some objectivity into the diagnosis of fibromyalgia, but the amount of pain caused by the disease can be measured only

subjectively."). Because the disabling symptom of fibromyalgia is typically pain, which is inherently subjective, whether fibromyalgia is disabling can only be determined by measuring the extent of a patient's physical limitations, not by a diagnostic or laboratory test. *Hawkins*, 326 F.3d at 919; *Speciale v. Blue Cross & Blue Shield Ass'n*, 538 F.3d 615, 622 (7th Cir. 2008). Thus, while it is true that the tender points test itself would not support functional limitations, that test is neither meant nor able to assess the extent of a patient's physical limitations, so this reason provides no basis on which to conclude that Ms. Boxell's fibromyalgia is not disabling.

The next statement, that Ms. Boxell had "normal joint motion and neurological function," is similarly unhelpful, as it provides no reason to believe these findings are inconsistent with a diagnosis of fibromyalgia, or are in any way related to the intensity or disabling effects of the pain Ms. Boxell experienced. The disabling symptom of fibromyalgia is pain, and these observations do not speak to the severity of Ms. Boxell's pain or its limiting effects. Finally, the statement that activity would be encouraged and therapeutic for such a condition provides no basis for concluding that Ms. Boxell is not limited in her ability to work. First, Ms. Boxell's job required her to sit at a computer for 90–95% of her 8-hour work day, which can hardly be described as "activity." Second, assuming this was referring to other, non-sedentary jobs, the fact that some sort of activity might be therapeutic does not mean that Ms. Boxell could necessarily perform all the activities a position might require and sustain that activity for long enough periods to keep steady employment. The question here is not whether Ms. Boxell can engage in activity at all, it is whether she is physically capable of maintaining employment, and this rationale does not speak to that question.

Rather than defending the reasons it offered at the administrative level, the Plan argues primarily that its decision was justified because Ms. Boxell failed to document the objective

physical limitations that resulted from this condition. In support of this argument, the Plan relies on *Speciale* and *Williams*, where the Seventh Circuit observed a distinction between the subjective severity of a condition and the objectively-measurable physical limitations the condition causes. *Speciale*, 538 F.3d at 622; *Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007). Those cases held that while a plan cannot insist on objective evidence as to the severity of a claimant's pain, it can require objective evidence of the limitations caused by that pain, and it can deny a claim that lacks such evidence. *Speciale*, 509 F.3d at 622–23; *Williams*, 509 F.3d at 322–24.

To the extent the Plan argues that there is no objective evidence of Ms. Boxell's physical limitations, though, that argument is factually unsupported. Ms. Boxell underwent a functional capacity evaluation on January 6, 2010, and the examiner opined that Ms. Boxell could only sit "occasionally" due to her complaints of pain in her legs and lower back. (R. 3045). The examiner also noted that Ms. Boxell gave good effort throughout the evaluation and that the validity measures indicated the results were valid. (R. 3048). Further, Dr. Fortin submitted at least three separate functional capacity assessments in which he indicated that Ms. Boxell could not sit for more than 15–20 minutes at a time due to her chronic low back and leg pain, and he later attributed that pain at least in part to Ms. Boxell's subsequent diagnosis of fibromyalgia. (R. 2735, 3919, 3977, 4005). This evidence distinguishes this case from *Speciale*, where no doctor opined that the claimant would be unable to work under the accommodations the employer offered to provide. 538 F.3d at 622.

To the extent the Plan seeks to discredit or distinguish this evidence, this argument falls short because the Plan failed to articulate those bases at the administrative level. *See Reich v. Ladish Co. Inc.*, 306 F.3d 519, 524 n.1 (7th Cir. 2002) (stating that the plan "was required to give

[the claimant] every reason for its denial of benefits at the time of the denial," and that it could not add new reasons during litigation). While it is plausible that the Plan could have articulated non-arbitrary reasons for discounting this evidence, as the plan did in *Williams*, 509 F.3d at 323, it did not do so, and the reasons it did offer were poor. Finally, as discussed at more length below, it would be improper for the Plan to rely on an absence of objective evidence of Ms. Boxell's disability, since its statement in the initial denial letter that Ms. Boxell was disabled due to fibromyalgia gave her no reason to respond and provide further evidence on that point. *See id.* (noting that "[t]he administrator clearly explained this concern [as to the lack of objective evidence of limitations] in both its denial letters" to the claimant).

The Plan finally seeks to justify its conclusion that fibromyalgia was not disabling by arguing that even "Dr. Fortin . . . expressly excluded the diagnosis of fibromyalgia as a 'disabling diagnosis' and instead identified it as just an 'additional diagnosis.'" [DE 52 p. 9]. This statement is false, and misstates the record. In an office visit on September 8, 2011, Dr. Fortin listed five "Impressions": "chronic low back pain"; "left hip osteoarthritis greater than right"; "Diffuse myalgias, arthralgias, and paresthesias"; "Fibromyalgia with possible co-existing regional conditions of Paget disease"; and "Estimated risk of controlled-substance abuse low." (R. 3847). Under chronic low back pain, Dr. Fortin also noted, "Differential diagnosis includes: 1. Lumbar facet syndrome. 2. Lumbar internal disc disruption. 3. Lumbar radiculopathy." (*Id.*). This particular office note did not identify any condition as "disabling" or distinguish between "disabling" and "additional" diagnoses in any way. However, the claims specialist may have mistaken "differential diagnosis" for "disabling diagnosis," as the September 16, 2011 termination letter stated:

> In the September 8, 2011 office visit note, Dr. Fortin listed your disabling diagnoses as chronic low back pain due to lumbar facet syndrome, lumbar internal

disc disruption and lumbar radiculopathy. Additional diagnoses listed were hip osteoarthritis, diffuse myalgias, arthralgias and paresthesias, and fibromyalgia with possible co-existing regional condition of Paget's disease.

(R. 3842). In its briefs, the Plan then relied on this language to argue that Dr. Fortin expressly excluded fibromyalgia as a disabling diagnosis. As the record demonstrates, though, Dr. Fortin did no such thing. Accordingly, the Court finds that there is an absence of reasoning in the record to support the Plan's conclusion that Ms. Boxell's fibromyalgia did not in any way limit or restrict her ability to work, which indicates that the Plan's decision was arbitrary and capricious.

### b.      The Social Security Decision

Second, the Plan did not offer any satisfactory explanation for discounting the Social Security Administration's finding that Ms. Boxell was disabled. Though, as discussed above, an administrator is not bound by a determination of disability by the SSA, "a plan administrator must address it and provide a reasonable explanation for discounting it." *Holmstrom*, 615 F.3d at 773. A plan's failure to do so "suggests arbitrary decisionmaking." *Id.*; *Glenn*, 554 U.S. at 118 (noting that, in addition to adding weight to the administrator's conflict of interest (which is not present here), the administrator's failure to adequately consider the Social Security decision was "an important factor in its own right" and "suggested procedural unreasonableness"); *Raybourne v. Cigna Life Ins. Co. of New York*, 700 F.3d 1076, 1085–88 (7th Cir. 2012). The Plan offered two reasons for discounting the SSA decision, the first of which was that the ALJ "stated that improvement was expected with appropriate treatment and recommended continuing disability review." (R. 574). But the ALJ found that Ms. Boxell continued to be disabled at least "through the date of [his] decision," or May 25, 2012, (R. 2687), eight months *after* the point the Plan claimed she was no longer disabled, (R. 575). Thus, while this reason may have justified a contrary finding at some point after May 25, 2012, it offers no explanation for how the Plan could find that Ms. Boxell was not disabled as of September 29, 2011.

The Plan's second reason was that the "Plan limits benefits for NMS and [Mental or Nervous Disorder] conditions to 12 months which [Ms. Boxell] received, however the Social Security Administration does not limit benefits based on conditions." (R. 574). However, the Plan did not terminate Ms. Boxell's benefits based on those limitations—it found that she was not disabled at all as of September 29, 2011, which directly contradicted the SSA's decision. Thus, this reason provides no justification for the Plan's disagreement with the SSA decision, either.[3] Accordingly, although the Plan did acknowledge the SSA decision, its failure to offer any plausible reason for discounting the SSA's finding is an indication that the Plan's decision was arbitrary and capricious.

###	c.	The Plan's Inconsistencies and Self-Contradictions

If the only flaws with the Plan's decision were its inadequate explanations for its findings on those issues, this may still be a close case, given the deferential standard of review. However, there are also a number of ways in which the Plan's reasoning was not only inconsistent over time, but self-contradictory. These contradictions not only suggest arbitrary and capricious decisionmaking, they denied Ms. Boxell a full and fair review of her claim by misrepresenting the issues on which she would need to provide additional evidence. Most notable among those contradictions is the fact that the Plan denied Ms. Boxell's appeal for different reasons than it initially terminated her benefits. In its September 16, 2011 letter informing Ms. Boxell that it was terminating her benefits, the Plan stated, "you are disabled due to low back pain and fibromyalgia," but that her benefits were expiring because those conditions were subject to the provision limiting long-term disability benefits for NMS conditions to 12 months. (R. 3841). In

_____

[3] The letter also noted, in explaining that the SSA decision was not binding on the Plan, that social security benefits are governed by different standards than those under the Plan. However, as *Holmstrom* noted in evaluating another policy with parallel language, "the Social Security standard for total disability is more stringent than the plan's standard for 'any-occupation' disability," so the different standards provide no relief to the Plan, either. 615 F.3d at 772.

denying her appeal, though, the Plan did not state that fibromyalgia was subject to any limitation, and instead upheld the termination on the basis that Ms. Boxell was not disabled at all. (R. 575).

This about-face not only exemplifies the definition of capricious, it implicates Ms. Boxell's right to a full and fair review of her claim, which includes being notified of the bases of the denial and having the opportunity to contest them. 29 C.F.R. § 2560.503-1(g). Since the Plan told Ms. Boxell in its September 16, 2011 letter that it had already found she was disabled due to fibromyalgia, she had no reason to submit additional evidence on that issue, nor did the Plan ever inform her what evidence she may need to provide to corroborate that she was disabled due to this condition. In this regard, the Plan did not just "move the target," it hid the target, giving Ms. Boxell no way to know she needed to contest the Plan's finding on this issue. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (noting that a plan's adherence to these regulations "enables a participant both to appreciate the fatal inadequacy of his claim as it stands and to gain a meaningful review by knowing with what to supplement the record").

The Plan's subsequent disclosure to Ms. Boxell of Dr. McPhee's report, which opined that she was not disabled by fibromyalgia, did not cure this problem. The Plan did not indicate in its letter disclosing the report that it intended to adopt this aspect of Dr. McPhee's report—the letter said it was seeking commentary on the report from Ms. Boxell's doctors, which would indicate that was still an open question—nor did it identify what materials Ms. Boxell could provide to counter this finding. 29 C.F.R. § 2560.503-1(g)(iii) (requiring a plan to describe "any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."); *Love*, 574 F.3d at 396; *Halpin*, 962 F.2d at 693 (holding that "the sending of the file, without sufficient indication of what parts of the file the Committee relied on or rejected, does not repair the inadequacy" of the explanation

in the letter denying benefits). In fact, the Plan did not invite a response from Ms. Boxell at all (though it did receive one); it merely asked her doctors to comment on the report, and it provided very short timeframes for them to do so. (R. 1697).

The Plan attempts to downplay this discrepancy by claiming that its initial statement that Ms. Boxell was disabled due to fibromyalgia was only a scrivener's error and should be disregarded, but the drafting history of the letter belies this assertion. *See Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 810 (7th Cir. 2010) (reviewing the drafting history of an ERISA plan to determine if a discrepancy was the result of a scrivener's error). The first draft of the letter said only that Ms. Boxell was disabled due to low back pain. (R. 4328). The claims specialist, who apparently drafted the letter, then emailed the draft to her supervisor, who inserted that Ms. Boxell was disabled "due to low back pain and fibromyalgia." (R. 4331). In her email returning this draft, the supervisor explained, "I also added fibromyalgia as one of the dxs [diagnoses] as previous reviews indicated med supported r/ls [restrictions and limitations] due to fibro[myalgia]." (R. 4330). The final version of the letter that MetLife sent to Ms. Boxell on September 16, 2011 included that language, and advised Ms. Boxell that the Plan found her disabled due to fibromyalgia. Thus, though the Plan apparently regrets this language in hindsight, this language was deliberately inserted into the letter, and clearly does not constitute a scrivener's error. *United States v.* Gibson, 356 F.3d 761, 766 n.3 (7th Cir. 2004) (noting that a scrivener's error is clerical in nature, and is not an error of reasoning or analysis).

The Plan's reliance on *Mote* for arguing that this scrivener's error would be harmless is also misplaced. *Mote* emphasized that because the error occurred in the final denial letter, it did not affect the claimant's ability to pursue her administrative remedies and present additional evidence to the Plan. 502 F.3d at 605 n.2. Here, the purported scrivener's error was in the initial

letter denying Ms. Boxell's claim, so she would have been justified in believing, as the letter stated, that the Plan already found her to be disabled due to fibromyalgia and that she need not submit any additional evidence on that point.

Furthermore, the Plan's ultimate finding that Ms. Boxell was not disabled not only contradicted its initial denial letter, it was inconsistent with its entire course of handling Ms. Boxell's claim. Granted, a claim administrator "is entitled to seek and consider new information and, in appropriate cases, to change its mind," so this change of heart does not necessarily equate to arbitrary and capricious decisionmaking. *Holmstrom*, 615 F.3d at 767; *Leger*, 557 F.3d at 832. Nonetheless, such inconsistencies can still "be considered in the court's review process," *Holmstrom*, 615 F.3d at 767, and a plan's failure to acknowledge and provide a non-arbitrary explanation for its deviation from its prior findings can require remand. *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771 (7th Cir. 2003).

Here, the Plan consistently concluded that Ms. Boxell was disabled over the two years it paid her short-term and long-term disability benefits. The Plan extended Ms. Boxell's benefits on multiple occasions throughout the short-term disability period, each time finding that she was disabled, meaning that she was unable to perform the essential functions of her job. (*E.g.*, R. 4045, 4027, 3972). The Plan then approved Ms. Boxell's application for long-term disability benefits, finding that she remained totally disabled as of September 29, 2010. (R. 3970, 364). The Plan also appears to have made the same finding in subsequent reviews in January and April 2011, even after Dr. Mattox opined on December 21, 2010, that Ms. Boxell was not disabled.[4] (R. 364, 399). Further, when the Plan initially terminated Ms. Boxell's long-term disability benefits based on the 12-month limitation, it noted that it still found her to be disabled as of

---

[4] The Plan actually continued to pay benefits for 10 months after that point, indicating that the Plan did not credit Dr. Mattox's opinion.

September 29, 2011, and the claims specialist even reassured Ms. Boxell on September 13, 2011 that "we are not questioning disability." (R. 446, 3841).

Nonetheless, the Plan upheld its termination of Ms. Boxell's benefits on the basis that she was no longer disabled, stating, "The information in the administrative claim file does not substantiate functional limitations beyond September 28, 2011. . . . Therefore, [Ms. Boxell] did not satisfy the Plan's Definition of Disability and no additional LTD benefits are available." (R. 575). The Plan did not acknowledge in this letter that it had already found Ms. Boxell to be disabled during this very period, nor did it explain why this conclusion differed from its previous ones.[5] This discrepancy could arguably be explained by the Plan's receipt of Dr. McPhee's report in the interim, as the Plan's reliance on that report is apparent from its letter. However, Dr. McPhee did not acknowledge or explain those discrepancies, either, *see Hackett*, 315 F.3d at 775 (noting that a plan's departure from its previous findings could have been justified had the medical expert referenced those findings and explained his deviation from them), and his reasoning for finding Ms. Boxell not disabled was flawed as to at least one of her conditions, as discussed above. Thus, the Plan could not have reasonably relied on the report alone as a basis for departing from its previous findings.

The Plan also appears to have changed its mind as to whether fibromyalgia was subject to the 12-month limitation of benefits. It the September 16, 2011 letter terminating Ms. Boxell's benefits, the Plan referred to fibromyalgia as a "Neuromusculoskeletal/Soft Tissue Condition[],"

---

[5] Granted, since the Plan had already paid 12 months of long-term disability benefits, the question at this point was less whether Ms. Boxell was disabled in general, and more whether she was disabled due to any condition not subject to a 12-month limitation. But even to the extent this inconsistency related to disabilities that remained subject to the limitation and would not have justified continuing benefits anyway, it still reinforces the conclusion that the similar inconsistency as to fibromyalgia, which apparently was not subject to a 12-month limit, was arbitrary and capricious as well.

and stated that it "fall[s] under the limited benefit provision of your Plan, and has a limitation of 12 months." (R. 3841). This was consistent with multiple references in the claims log and statements to Ms. Boxell that fibromyalgia was a neuromusculoskeletal condition subject to a 12-month limit. (R. 401 ("Claimant remains under treatment with pain management for chronic diffuse pain, myalgias, paresthesias secondary to Fibromyalgia, which is an LDB [Limited Disability Benefit] condition."); 403 ("Advised [Ms. Boxell] clinical [*sic*] advised Firbo [*sic*] is LBC [Limited Benefit Condition] also."); 404 ("LDB continues to apply for DX Fibromyalgia."); 408 ("[Claims specialist] confirmed with [Ms. Boxell] again that Fibro[myalgia] would fall under LBC."); 410 ("[Ms. Boxell] wanted to know why/how Fibro[myalgia] falls under a LBC also. [Claims specialist] advised [Ms. Boxell] myalgia's and myositis' fall under neuromusculoskeletal which is a LBC."); 416 ("LDB still applies—LDB will continue to apply for DX of Fibromyalgia."); 426 ("Fibro[myalgia] would be considered a LDB also.")). Had that continued to be the case, it would have been immaterial whether Ms. Boxell was actually disabled by fibromyalgia, as she would have already received all the benefits she was due for such a condition.

However, an entry in the claims log on May 1, 2012 indicates that the Plan reversed its interpretation of this provision. Specifically, the entry notes that "AS [Appeals Specialist] received verification from Claim UL [Unit Leader]" that "chronic fatigue/fibro. does not apply to the LDB provision." (R. 492). Thereafter, no further entries reference fibromyalgia as being subject to any limitation, and the letter upholding the termination of Ms. Boxell's benefits did not either. (R. 566–575). But despite this apparent change in its interpretation of this provision, the Plan never expressly acknowledged to Ms. Boxell that it had changed its mind, nor did it ever provide reasons for having done so. This unexplained discrepancy is a clear indication of

arbitrariness and capriciousness, and violated ERISA's procedural requirements as well. Had the Plan informed Ms. Boxell that she could continue to receive long-term disability benefits if she could demonstrate that she was disabled due to fibromyalgia, she would have had incentive to develop the record on that point. But without having done so, and having already told her that it found her to be disabled due to that condition, the Plan's termination of Ms. Boxell's benefits on the basis that she was not disabled due to fibromyalgia was improper.

For all of these reasons, the Court concludes that the Plan has not substantially complied with its obligation to articulate non-arbitrary reasons for its decision and to afford Ms. Boxell an opportunity for full and fair review of her claim, so the Court finds that the Plan's decision was arbitrary and capricious and must be vacated.

### d. Other Arguments

Ms. Boxell makes several arguments that are unavailing. First, she spends considerable effort trying to establish that MetLife denied her claim because of its conflict of interest. This argument is misplaced, though, since MetLife does not have any structural conflict in this matter. Long-term disability benefits under the Plan are paid by a trust that is self-insured and that is funded with employee contributions. Meanwhile, all claims decisions are made by MetLife, the claims administrator, which neither funds nor insures the Plan. (R. 47). Thus, MetLife has no financial interest in the outcome of its claims, and is not conflicted. *Aschermann v. Aetna Life Ins. Co.*, 689 F.3d 726, 729–30 (7th Cir. 2012) (noting that the delegation of claims determinations to a third party without any financial interest in the outcomes "reduced any potential for conflict," and that, if anything, the third party claims administrator's incentive was to favor the claimants, not the plan).

Ms. Boxell also argues that the Plan's procedures were flawed because it did not have a written internal policy governing whether fibromyalgia was subject to a 12-month limitation of

benefits. In support of this argument, Ms. Boxell cites a regulation that requires plans to "establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations," which must include "administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and that, where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants." 29 C.F.R. § 2560.503-1(b)(5). Ms. Boxell's interpretation of this regulation as requiring a written policy for fibromyalgia is unreasonably broad, however, and would essentially require every exercise of a plan's discretion to be governed by a written policy. Ms. Boxell has not cited any authority supporting such a proposition, nor has the Court located any, so the fact that the Plan did not rely on a written policy in determining whether fibromyalgia was subject to a limitation is immaterial.

Finally, Ms. Boxell argues that the Plan must be interpreted to limit benefits only for conditions that affect both the neuromusculoskeletal system *and* soft tissues, such that conditions that only affect one or the other would not be subject to the 12 month limitation on benefits. Ms. Boxell's interpretation of this provision is a bit of a reach, though. The provision in question limits benefits if a claimant becomes disabled "due to a neuromusculoskeletal and soft tissue disorder," which might reasonably be interpreted as referring to a disorder within the class of neuromusculoskeletal and soft tissue disorders, which could encompass diseases affecting one or the other, rather than only disorders that affect both a claimant's neuromusculoskeletal system and their soft tissues. The Court need not decide that question, though, because Ms. Boxell has failed to show that anything turns on these competing interpretations. Ms. Boxell suggests in her reply brief that "Paget's disease, degenerative disc disease, facet arthropathy, [and] lumbar facet

syndrome with radiculopathy" are only neuromusculoskeletal disorders, not soft tissue disorders, but she offers no authority for that assertion. Further, she fails to establish that any of these were actually disabling conditions, or, more to the point, that the Plan's conclusion to the contrary as to any of these particular conditions was arbitrary and capricious. Accordingly, this would not be a basis for vacating the Plan's decision.

### 2. The Remedy

Having found that the Plan acted arbitrarily and capriciously in terminating Ms. Boxell's benefits, the Court turns to the proper remedy. "Courts that find a plan administrator's denial of benefits to be arbitrary and capricious may either remand the case for further proceedings or reinstate benefits." *Leger*, 557 F.3d at 835 (quoting *Tate*, 545 F.3d at 562–63). However, "generally, when a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case is to remand for further findings or explanations, unless it is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Id.* (internal alterations omitted). Here, remand is required, as the record is not unequivocal as to whether Ms. Boxell is disabled due to a condition not subject to a 2-year limitation under the Plan. Even one of her own doctors believed she was able to return to work without restriction, and if she was disabled, that disability may have been subject to a limitation of benefits. Thus, although the Plan has failed to adequately justify its decision, the Court cannot definitively conclude on this record that it would have been unreasonable for the Plan to terminate Ms. Boxell's benefits.

Courts sometimes recognize an exception to this general rule where a plan that has already determined that a claimant is entitled to the benefits at issue terminates those benefits through defective procedures. *E.g.*, *Holmstrom*, 615 F.3d at 778–79; *Hackett*, 315 F.3d at 775–76; *Halpin*, 962 F.2d at 697. *But see Love*, 574 F.3d at 398 (remanding for further consideration

even though the decision to terminate benefits was arbitrary and capricious); *Leger*, 557 F.3d at 835 (same). In those circumstances, returning the parties to the status quo means reinstating benefits to which the claimant had already been found entitled and which the plan had not properly terminated. *E.g.*, *Holmstrom*, 615 F.3d at 778–79. That exception does not apply here, though, since the Plan had never found Ms. Boxell to be eligible for long-term disability benefits past the 12-month limitation. (R. 3970). *See Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477 (7th Cir. 1998) (holding that since the claimant "was not scheduled to continue receiving benefits" at the time of the termination, the proper remedy was to remand). Even though the Plan failed to adequately justify its decision, the status quo prior to that decision was that Ms. Boxell's benefits would terminate on September 28, 2011, so retroactively reinstating Ms. Boxell's benefits would be improper.

Accordingly, the Court remands this matter to the Plan to conduct a full and fair review of Ms. Boxell's claim. Should the Plan ultimately decide that Ms. Boxell was entitled to benefits as of September 29, 2011, it should retroactively reinstate her benefits, though it remains free to review her continuing eligibility for benefits in the future. Should the Plan conclude that Ms. Boxell was not entitled to benefits after September 28, 2011, it should identify all the bases for its decision, allow Ms. Boxell to submit evidence in support of her claim, and provide non-arbitrary reasons in support of its decision and for discounting any credible evidence to the contrary.

**B.** **The Fund's Entitlement to Reimbursement**

The Fund has separately asserted a counterclaim against Ms. Boxell for reimbursement of overpayments it made as a result of her receipt of retroactive social security benefits. Under the terms of the Plan, a claimant's long-term disability benefits are reduced by any benefits the claimant receives from other sources, including social security disability benefits. (R. 36). The

Plan further provides that when a claimant receives an award of such benefits retroactively, the Plan is entitled to recover any amounts it paid in excess of what the claimant was entitled to, and that those amounts are "subject to a constructive trust in favor of the plan." (R. 37, 56). Ms. Boxell began receiving Long Term Disability benefits on September 29, 2010, and on May 25, 2012, the SSA determined that she was entitled to social security disability benefits and awarded benefits retroactive to March 1, 2010. (R. 2675, 2687). The Plan thus calculates that it overpaid Ms. Boxell's benefits by $12,828. (R. 2654).

These sorts of provisions can be enforced through ERISA under 29 U.S.C. § 1132(a)(3), as the Supreme Court held in *Sereboff v. Mid Atl. Med. Servs.*, 547 U.S. 356 (2006), and the Seventh Circuit has enforced similar provisions requiring the reimbursement of retroactive social security benefits. *Gutta v. Standard Select Trust Ins. Plans*, 530 F.3d 614, 620–21 (7th Cir. 2008); *see Weitzenkamp v. Unum Life Ins. Co of Am.*, 661 F.3d 323, 331–32 (7th Cir. 2011). In addition, Ms. Boxell signed an agreement prior to receiving her long-term disability benefits in which she agreed to reimburse the Plan for any overpayment it might make as a result of a retroactive award of social security benefits, so this reimbursement could be enforced contractually as well. (R. 3999). Ms. Boxell did not address the Plan's counterclaim in her own motion for summary judgment, and she did not respond to the Plan's motion for summary judgment as to this issue, meaning she failed to contest either her obligation to repay or the amount that she owes. Accordingly, the Court grants the Fund's motion for summary judgment as to its counterclaim, and finds that the Fund is entitled to reimbursement in the amount of $12,828.

## V. CONCLUSION

The Court DENIES the Plan's motions to strike [DE 46, 50] and Ms. Boxell's motion for leave to amend her complaint [DE 54]. The Court GRANTS Ms. Boxell's motion for summary

judgment [DE 38], and REMANDS this matter to the plan administrator to determine, after conducting a full and fair review, whether Ms. Boxell is entitled to Long Term Disability Benefits after September 28, 2011. Finally, the Court DENIES the Plan's motion for summary judgment [DE 40] as to Ms. Boxell's claim, but GRANTS that motion as to the Plan's counterclaim, and enters judgment in the Plan's favor on its counterclaim in the amount of $12,828.

SO ORDERED.

ENTERED: September 22, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court